UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PLAINFIELD SPECIALTY HOLDINGS II INC.,

        Plaintiff/Counter-Defendants,

v

                                              Case No. 08-14905

CHILDREN'S LEGAL SERVICES PLLC
and KENNETH A. STERN,                          Hon. Nancy G. Edmunds

        Defendants,

and

KENNETH A. STERN,

        Counter-Plaintiff,

and

PLAINFIELD SPECIALTY HOLDINGS II INC.,

        Counter-Defendant.

and

CHILDREN'S LEGAL SERVICES PLLC,

        Counter-Plaintiff,

v

PLAINFIELD SPECIALTY HOLDINGS II INC.,

        Counter-Defendant.

_____/

**ORDER GRANTING
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Plainfield Specialty Holdings II Inc. ("Plainfield," "Plaintiff," or "Lender") filed a motion with this Court on January 22, 2009 requesting the following injunctive relief against Defendants: (1) order directing Children's Legal Services PLLC ("CLS" or "Borrower") to pay all Collateral, including proceeds of legal fees and other accounts receivable, into either a frozen lockbox account or the Court; (2) order directing CLS to direct all third parties owing money to CLS to deposit such funds in the lockbox account or Court account; and (3) ordering third parties who received a portion of the Collateral to immediately return said funds to the lockbox account.

At the conclusion of the February 5 and 6, 2009 evidentiary hearing on Plainfield's motion (the "Hearing"), this Court entered a temporary restraining order (the "TRO") enjoining CLS and Kenneth A. Stern ("Stern"; together with Borrower, the "Defendants"), the principal of CLS and a guarantor under the loan from Plainfield to CLS, from making any disbursements from any accounts controlled by them other than for payment of ordinary course operating expenses and attorneys' fees, compelling the Defendants to identify all disbursements made since January 1, 2009 and requiring the Defendants to file and serve upon Plainfield a weekly update of that disbursement report. (Tr. 2/6, 212:15 - 215:20)[1]

Based on the evidence presented at the Hearing, the Court GRANTS Plainfield's motion for a preliminary injunction.

1.    Plainfield loaned $16,875,500 in principal to CLS.  (Ex. 12)[2]  CLS has been in default since October 2007 by failing to pay all interest due and owing to Plainfield and

_____

[1] All references to ("Tr. 2/5") correspond to pages in the Rough Trial Transcript from testimony on February 5, 2009 and all references to ("Tr. 2/6") correspond to pages in the Rough Trial Transcript on February 6, 2009.
[2] References to "Ex." refer to those exhibits admitted into evidence at the Hearing.

has not made any payments since May 2008. (Tr. 2/5, 73:10-13)  As of November 24, 2008 as set forth in Plainfield's complaint, CLS owes Plainfield $20,528,897.69, and interest continues to accrue. (Complaint, p. 15)

2.      Plainfield holds a perfected security interest in substantially all of CLS' personal property, including without limitation all cases referred by CLS to the Affiliate Law Firms (defined below). (Ex. 116)  Plainfield has made demand on CLS to comply with its obligations under the Loan Documents (defined below) and make payment to Plainfield of all fees earned by CLS relating to each case that is included in Plainfield's collateral.  CLS has not done so. (Ex. 154)

3.      As detailed below, the Court finds that the status quo must be preserved lest additional funds be irreparably disbursed and Plainfield is left without any Collateral from which to collect in the event it prevails in this litigation. CLS has demonstrated that the amount of fees it has historically collected ($3.5 million over 2½ years), together with its actions regarding fees earned over the past few months, require issuance of an injunction in order to preserve the status quo pending a complete adjudication of the merits of this action.

4.      The Court further finds that Plaintiff has demonstrated that it is likely to succeed on the merits of this litigation.  The loan agreement between Plaintiff and CLS, as well as the parties' course of dealings, demonstrates that the maximum amount of the loan from Plaintiff to CLS was initially $15 million and thereafter raised only via written, executed supplements to the loan agreement.  The unambiguous loan documents, the parties' course of dealings, the merger and integration clauses in the loan agreement and the releases executed by CLS in conjunction with the Third and Fourth Supplements, all support Plainfield's position.

3

5.      The Court further finds that the balancing of the harms and public policy favor issuance of an injunction.   Plaintiff has stated that it is open to moving forward with the litigation as expeditiously as necessary in order to lessen any alleged impact of the injunction upon CLS.  Moreover, this Court shall continue to permit CLS to pay for essential business costs, subject to independent verification of the Custodian appointed hereby.  Such measures ameliorate any potential harm to CLS by issuance of an injunction.

As described in more detail below, the following relief shall be granted to Plainfield and injunctions imposed upon Defendants (the "Injunctive Relief"):

- Defendants shall immediately, and continually as required to effectuate the result contemplated by the Court's order, deposit all funds in which it has an interest (including without limitation any joint venture account with any Villari, Brandes & Kline, P.C. ("Villari") affiliate or affiliate of McKeen & Associates ("McKeen") or otherwise) in to the "lockbox" account and shall not use or disburse any such funds except as provided for herein.

- Defendants shall immediately notify all third parties, including Villari and McKeen, that hold funds in which Defendants hold or may hold an interest, whether contingent or not, in writing, demanding each of them transfer such funds to the CLS lockbox account and otherwise not disburse any of the funds.

- [Person to be determined] shall be, and hereby is, appointed custodian for CLS with the powers as set forth in Schedule A attached hereto.

The Court finds that the injunctive relief is appropriate and reasonably crafted to protect Plainfield's protected security interest.

4

## I.      FINDINGS REGARDING BACKGROUND FACTS

### A.      Origins of Loan Transaction

1.      Borrower provides legal services to families with children affected with cerebral palsy. (Def. Counterclaim ¶9)  Borrower markets its services through its web site (http://www.4mychild.com), toll-free phone number (1-800–4MY–CHILD), and other mass media marketing tools, primarily television, print, and other media advertisements. (Complaint ¶6; Answer ¶6)

2.      After an initial evaluation, Borrower refers those cases worthy of prosecution to a series of other law firms ("Affiliate Law Firms") and enters into fee sharing agreements with those firms. (Def. Counterclaim, ¶¶ 10-12)  The payment to Borrower of its share of those fees once the cases are resolved is Borrower's principal revenue source.

3.      On June 16, 2006, CLS, Stern and Plainfield (originally Plainfield Offshore Holdings XI Inc., later assigned to Plaintiff) entered into a lending transaction at which over 20 loan documents were executed, delivered and distributed.  The principal loan document from that transaction is entitled Revolving Credit Facility Loan Agreement (the "Loan Agreement").  (Ex. 101)

4.      The Loan Agreement specified an aggregate amount not to exceed $15,000,000 (the "Maximum Facility Amount"), as further defined in the Definitions section of the Loan Agreement.  (Ex. 101 § 1.1, p. 8)  Defendants admitted at the hearing that the maximum amount they could borrow under this Loan Agreement was $15 million.  (Tr. 2/6, 189:13-18)

5.      To secure payment and performance of all of CLS' obligations under the Loan Agreement, CLS granted a first priority security interest to Plainfield in, among other

property, all cases referred by CLS to the Affiliate Law Firms (the "Collateral"). (Ex. 101 § 9.1-9.2, pp. 49-51)  Plaintiff perfected its security interest in the Collateral by filing the required financing statements with the Secretary of State of Michigan, including a UCC-1 financing statement filed on June 19, 2006, file number 2006108795-6. (Ex. 116)

6.     The Loan Agreement provided for Stern on behalf of CLS to set forth in the Borrowing Base Certificate various classes and categories of cases referred by CLS to Affiliate Law Firms. (Ex. 101 § 2.9-10, pp. 23-26, Exh. A)  The categories reflected the level of investigation and level of progress in the case to the point and time of inclusion in a given Borrowing Base Certificate.  (*Id.*)

7.     The Loan Agreement obligated CLS on a monthly basis to prepare and submit a Subject Case List setting forth various required information as to the identity and progress of the cases and contacts received and referred by CLS. (Ex. 101 §2.8, pp. 21-23)

8.     The amount of advances that CLS could draw based on any particular Category of case included in the Borrowing Base Certificate was determined by a formula set forth in the Loan Agreement.  Generally speaking, as a case progressed towards settlement, (a) CLS was eligible to borrow a greater percentage of the case's anticipated value as certified by CLS; and (b) the interest rate on such advances decreased. (Ex. 101 § 2.10, pp. 25-26)

9.     In addition to the loan draws available to CLS based on cases by category as set forth in the Borrowing Base Certificate, the Loan Agreement provided for CLS to be able to obtain Marketing Loans which were available without regard to any particular case set forth in the Borrowing Base Certificate. (Ex. 101 § 1.1, pp. 9-10)

10.     At the closing of the loan transaction, CLS submitted a Subject Case List to Plainfield that was attached to the Loan Agreement (the "Original Subject Case List").  (Ex.

101 at PSH 024202-024205)[3]  The Original Subject Case List, prepared by CLS, projected that CLS would receive payment of over $14 million by June of 2008 and $18,571,698 by the end of the first quarter of 2009.  (*Id*.)

**B.      Other Key Terms of Loan Agreement and Related Closing Documents**

11.     The Loan Agreement contained a complete and broad merger and integration clause denying the existence of any other "agreements and understandings" (§12.13), a provision stating that modifications could only be in writing signed by the parties (§12.10), and a provision waiving any counterclaims or set-offs relating to the Loan Agreement or any other agreements or course of conduct relating to it. (§12.5).   New York law governs the Loan Agreement. (Ex. 101, pp. 60-61, 62, 64)

12.     In addition, at closing, CLS' counsel delivered an opinion letter from counsel for Defendants affirming that the "Loan Documents constitute valid and binding agreements of Borrower enforceable against it in accordance with their respective terms…." (Ex. 109)

13.     After the closing, CLS, Plainfield and Signature Bank entered into a Blocked Account Control Agreement dated as of July 12, 2006. (Ex. 104)  The Blocked Account Control Agreement, consistent with the Loan Agreement (§9.9), required CLS to deposit all proceeds of any kind in the account (the "Lockbox") identified therein. (*Id*.)  Payments into the Lockbox were swept into a Plainfield account and applied to pay interest first, then to reduce the principal amount of the Loans.  (Tr. 2/5, 34:13-35:1)

---

[3] Numbers preceded with "PSH" or "CLS" are the identifiers placed on all documents produced by the parties and are used herein, at times, to more specifically identify page numbers of exhibits.

14.     On the date of the Loan Agreement, CLS borrowed $11,254,187.31 from Original Lender.  From this sum, CLS paid $9,809,704.50 to various pre-existing creditors. (Ex. 120; Tr. 2/5, 39:7-11)

**C.     Initial Administration of the Loan; First and Second Supplements**

15.     After execution of the Loan Agreement, Stern and CLS consistently sought additional funding beyond the Maximum Facility Amount of $15,000,000. (Tr. 2/5, 80:09-24)  An original approved budget was attached to the Loan Agreement.  (Ex. 101, pp. PSH 024206-024238).  The Loan Agreement required CLS to propose annual budgets at least thirty days before year-end. (Ex. 101 §5.2(c), p. 37)  If Plainfield did not accept a proposed budget, the previous effective budget remained in effect.[4]

16.     In February 2007, Plainfield agreed to increase the Maximum Marketing Loan Amount from $500,000 to $1 million. (Ex. 121)  To evidence and memorialize this agreement, Plainfield, CLS and Stern entered into that certain First Supplement to Loan Agreement dated as of February 17, 2007 (the "First Supplement").  (*Id.*)

17.     After execution and delivery of the First Supplement, CLS and Stern continued to request additional increases to the Maximum Marketing Loan Amount.  In July 2007, Plainfield agreed to increase the Maximum Facility Amount to $15,500,000 and to increase the Maximum Marketing Loan Amount to $1,500,000.  (Ex. 122)  To evidence this agreement, Plainfield, CLS and Stern executed and delivered that Second Supplement to Loan

---

[4] In December 2006, CLS submitted a proposed annual budget. (Ex. 501).  Plainfield testified that it did not accept this budget. (Tr. 2/6, 54:10-13)  Notwithstanding, there is nothing in the Loan Agreement which obligates Plainfield to make loans in excess of the Facility Amount. Rather, as demonstrated by the parties' course of dealings, any increase in the Facility Amount was accomplished only by an executed Supplement to the Loan Agreement. (Tr. 2/5, 80:09-18)

Agreement dated as of July 3, 2007 (the "Second Supplement"), and CLS executed and delivered to Plainfield an additional Revolving Credit Note in the principal amount of $500,000 to evidence CLS' additional loan under the Second Supplement.  (*Id*.; Ex. 124)

> **D.**     **Initial Default; Levy Report; Third and Fourth Supplements**

18.     By the time of the Second Supplement, more than twelve months after the closing of the Loan Agreement, CLS had not generated case proceeds even close to the amount projected in the Original Subject Case List. (Ex. 180)

19.     CLS was required to pay interest accruing on the loans monthly, with the interest payment date being the first calendar day of each month.  (Ex. 101 § 2.6, pp. 19-20) CLS failed to pay timely the interest payment due on September 1, 2007.  (Tr. 2/5, 52:22-53:3) On September 10, 2007, CLS drew down a loan in the amount of $533,811.51, of which it used the sum of $188,531.46 to pay accrued interest and borrowed the rest as a loan for use in its business. (Ex. 168, p. PSH 000033)

20.     On October 1, 2007, CLS failed to pay the accrued interest due of $245,235.65. (Ex. 154)

21.     Even after defaulting on its interest payment obligations, CLS continued to request additional loans from Plainfield.  (Tr. 2/6, 55:2-10)  Though Plainfield could have accelerated repayment of the outstanding loan, it did not do so at that time, instead trying to work with CLS to try to restructure the loan in a mutually acceptable way.  (Tr. 2/6, 50:8-14)

22.     On or about November 26, 2007, Plainfield agreed to increase the Maximum Facility Amount by $500,000 and to increase the Maximum Marketing Loan Amount within that facility to $2,000,000.   To evidence this agreement, Plainfield, CLS and Stern executed and delivered a Third Supplement to Loan Agreement (the "Third Supplement") and

CLS executed and delivered to Plainfield an additional Revolving Credit Note in the amount of $500,000 to evidence CLS' additional loan. (Exs. 127, 128)

23.     The Third Supplement contained a release from CLS to Plainfield which provided in relevant part (the "Release Language"):

> (a)     …Borrower. . .hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges the Lender . . . from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of setoff, demands and liabilities whatsoever . . .which arises at any time on or prior to the date of this Amendment, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Loan Agreement, or any of the other Loan Documents or transactions thereunder or related thereto.
>
> (b)     The Borrower understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(Ex. 127)

24.     CLS submitted a proposed budget in December 2007.  (Ex. 504)  The proposed budget projected an increase in the loan from a maximum of $15,500,000 to over $120 million. (*Id.*)  Again, while Plainfield testified that it never agreed to the budget (Tr. 2/6, 54:14-18) or funding beyond that contained in the Loan Agreement, it is uncontested that the parties continued to document actually agreed upon Facility Amount increases via written Supplements and there is nothing in the Loan Agreement that could compel Plainfield to loan CLS funds based upon CLS' budget. (Exs. 122-131)

25.     On or about March 3, 2008, at CLS's request for additional funding, Plainfield and CLS agreed to an increase in the Maximum Facility Amount by $370,000.  To

evidence this agreement, Plainfield, CLS and Stern executed that Fourth Supplement to Loan Agreement ("Fourth Supplement") to evidence the foregoing transactions.  (Ex. 124)

26.     In addition, CLS executed and delivered to Plainfield that certain Revolving Credit Note in the amount of $370,000 dated March 3, 2008 to evidence its obligation to repay the additional amount of credit extended pursuant to the Fourth Supplement. (Ex. 129) The Fourth Supplement contained the same Release Language that is contained in the Third Supplement. (*Id.*)

### E.     Continued Default; Fifth and Sixth Supplements

27.     Stern and CLS continued to notify Plainfield that CLS was experiencing financial difficulty and that CLS was seeking additional financing. (Exs. 144-151)    Certain requests by CLS included suggestions in May 2008 that failure to make increased loans would jeopardize Plainfield's collateral. (Tr. 2/6, 180:05-12; Exs. 148-149)

28.     In May 2008, CLS made a payment of $390,000 towards the loan.  (Ex. 168, p. PSH 000062)  This amount was insufficient to cure interest arrearages that had accrued since September 2007.  Nevertheless, Plainfield continued to attempt to work with CLS towards an orderly restructuring of CLS's debt.

29.     On July 15, 2008, Plainfield, CLS and Stern executed that Fifth Supplement to Loan Agreement (the "Fifth Supplement") to confirm a loan made on June 2, 2008 from Plainfield to CLS in the principal amount of $150,000 and an additional loan made on July 15, 2008 from Plainfield to CLS in the amount of $105,000. (Ex. 125)  CLS executed and delivered to Plainfield that certain Revolving Credit Note in the original principal amount of $255,000 to evidence its obligations with respect to the additional loans made pursuant to the Fifth Supplement. (Ex. 130)

30.     Plainfield, CLS and Stern executed and delivered a Sixth Supplement to Loan Agreement (with the other supplements, the "Supplements") pursuant to which Plainfield increased the Maximum Facility Amount by an additional $160,500 to a total of $16,785,500. (Ex. 120)  To evidence CLS' obligation to repay the additional loan made as set forth in the Sixth Supplement, CLS executed and delivered that certain Revolving Credit Note (together with the other notes described above, the "Notes"). (Ex. 131)

31.     Plainfield and CLS continued to have negotiations concerning a possible restructuring through the Summer of 2008. (Tr. 2/5, 66:25-67:16)  At a meeting in August 2008 CLS threatened Plainfield with legal action if Plainfield refused to fund further. (Tr. 2/5, 69:18-70:20)  After this, productive restructuring discussions soon trailed off. (Tr. 2/5, 70:21-71:9)

**F.     Notice of Default; Commencement of Litigation**

32.     Plainfield, through its counsel, issued a notice of default to CLS and Stern dated November 24, 2008.  (Ex. 154)  In that notice, Plainfield demanded immediate payment of all amounts due and owing under the Loan Documents. (*Id*.)

33.     As of November 24, 2008, the amount of the Obligations due and owing under the Loan Documents was $20,528,897.69, consisting of:

a.      principal in the amount of  $16,785,500.00;

b.      interest accrued through November 24, 2008 of $3,070,672.65; and

c.      default interest of  $672,725.04 through November 24, 2008.

(Ex. 154)

34.     Interest has continued to accrue on the unpaid principal balance since November 24, 2008.  No payments have been made by CLS since the $390,000 paid in May 2008.  (Tr. 2/5, 73:10-13; Ex. 168, pp. PSH 000062-000076)

12

35.     On November 24, 2008, Plainfield commenced this action by filing a complaint with this Court against CLS and Stern, seeking, *inter alia*, to enforce Plainfield's rights and remedies under the original and supplemental Loan Documents.

36.     On or about December 4, 2008, Plainfield filed a motion with this Court seeking appointment of a custodian under Article 12 of the Loan Agreement and pursuant to the Court's inherent powers.   On December 18, 2008, the Court denied that motion but ordered expedited discovery.

37.     On December 12, 2008, CLS and Stern filed answers, affirmative defenses and counterclaims against Plainfield.   Those counterclaims center on CLS' and Stern's allegation that Plainfield made an oral promise to loan CLS monies in excess of the Facility Amount.

## II.     FINDINGS REGARDING THE BASES OF PLAINTIFF'S PRELIMINARY INJUNCTION MOTION

### A.     CLS Reveals Funds Being Held by Joint Venture With Villari ("JV")

38.     Stern filed an affidavit sworn to December 11, 2008 in opposition to the Plainfield custodian motion (the "Stern Affidavit").

39.     As noted above, under both the Loan Agreement and the Blocked Account Control Agreement, CLS is required to deposit funds generated from cases into the Lockbox. (Ex. 101 § 9.9, p. 53)

40.     Stern represented to this Court in the Stern Affidavit that CLS had always and was continuing to abide by this requirement. (Tr. 2/6, 164:5-18; Stern Affidavit, ¶7)

41.     The Court relied upon the Stern Affidavit and CLS' other representations in denying the Custodian motion, but did permit expedited discovery and told Plainfield that it could thereafter file a motion for preliminary injunction if necessary.

42.     On January 9, 2009, in response to Plaintiff's expedited discovery requests, CLS revealed that Villari had deposited over $1.6 million into a bank account ("the JV Account") in the name of "Villari, Brandes, Klein & Stern" ("the JV"), a joint venture between Villari and Stern, in two installments on December 4 and 23, 2008. (Ex. 165).

43.     Villari's deposit of these funds into the JV Account, and disbursement of same by Stern, was not revealed to the Court in the Stern Affidavit nor in CLS' submissions and argument to the Court in connection with Plainfield's custodian motion. (Tr. 2/6, 165:23-166:7).

44.     Villari's deposit of these significant funds into the JV Account is inconsistent with past practice. Historically, CLS' general ledger reflects deposits directly from "VBK" for Villari, Brandes & Klein (not VBKS, for the JV). (Tr. 2/6, 160:19-161:5; Ex. 172, *e.g.* at CLS628).

45.     Villari purported to deposit those funds into the JV Account with various conditions, none of which included payments to Plainfield, but which allowed CLS to write checks out of the JV account in order to pay essential CLS expenses. (Ex. 163).

46.     The treatment of these funds is inconsistent with the agreement which controls the relationship between Villari, CLS and the JV. That agreement provides that gross proceeds (not net of Villari's share, as was the case here) be deposited into the JV Account and that allocated payments to the members (Villari and CLS) be made within 5 days thereafter. (Ex. 158, p.30; Tr. 2/6, 173:25-174:12)

47.     During the month of December, and without the knowledge of Plainfield or the Court, Stern directed the JV to disburse $775,507 out of the JV Account to pay various expenses, including significant sums to at least five different law firms. (Ex. 166)

48.     When CLS finally produced the JV ledger on January 22, 2009, it stated that $782,875 remained in the JV account.  (Ex. 169)  CLS pledged via letter dated January 9, 2009 that "The remaining funds will be maintained in the joint venture account." (Ex. 165).

49.     After failing to reach an agreement with CLS regarding the JV funds or the handling of future revenues, Plainfield filed its Motion for Preliminary Injunction to Preserve Collateral on January 22, 2009.

**B.    CLS' Disclosure of Additional Collateral Being Held Outside of CLS**

50.     Stern testified on February 6, 2009 that two Affiliate Law Firms received settlements on CLS-originated cases and were holding back the CLS portion of the funds.  (Tr. 2/6, 138:18-139:14)

51.     Specifically, Villari is holding approximately $500,000 associated with CLS-originated cases, and McKeen & Associates ("McKeen") is holding approximately $1.8 million associated with at least two settled matters.  (Tr. 2/6, 138:18-139:14; 138-9, 150-153; 151:6-152:14).[5]

52.     Under the Villari Agreement which controls the relationship between Villari and CLS, Villari should have placed the funds into the JV Account (gross of Villari's share of said funds) and then, within five days, should have distributed allocate shares of said

_____

[5] The McKeen funds were known to Stern in early December and he admits to not revealing them to Plainfield or this Court before February 6, 2009.  (Tr. 2/6, 154:4-7).  It is unclear when Stern became aware of the funds being withheld by Villari.  The $3.9 million in fees from resolved cases – the $1.6 million deposited in to the JV Account in December, the $1.8 million being held by McKeen and the $500,000 being held by Villari – are significant amounts in the context of CLS' past recovery of fees.  (Ex. 180) Since mid-2006, the next largest recovery ever received by CLS was $525,544 (and that was in July of 2006) and CLS' total recovery during the preceding 2½ years had only been $3.5 million. (*Id*.).

funds to Villari and CLS.   (Ex. 158) There is no provision under the Villari Agreement permitting it to either take its share before depositing funds into the JV Account nor is there any basis for altogether withholding fees which relate to CLS-originated cases.   (*Id.*)

## III.   CONCLUSIONS OF LAW

### A.   General Standard for Injunctive Relief

In deciding whether to grant a preliminary injunction, a district court "must consider: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994) (citation omitted).

### B.   Plaintiff has Demonstrated A Likelihood of Success on the Merits

The Loan Agreement, the Notes and the Supplements were executed and delivered by CLS.  (Exs. 101-102, 121-131) UCC-1 and UCC-3 financing statements covering the Collateral were filed with the Michigan Secretary of State.  (Ex. 116) CLS has failed to pay all interest accrued since September 30, 2007 and has not made any payments since May 2008. As of November 24, 2008, the amount of the Obligations due and owing under the Loan Documents was $20,528,897.69.   (Ex. 154) Interest, costs and expenses under the Loan Documents have continued to accrue.   Thus, in the absence of a meritorious defense or counterclaim by CLS, Plainfield is likely to prevail on the merits of its claims.

CLS claims fraud in the inducement based upon alleged promises to loan CLS upwards of $100 million. (CLS Counterclaims, pp. 12-34)   CLS alleges that: (1) Plainfield fraudulently induced it to enter into the Loan Agreements with extra-contractual promises of

additional credit; and (2) CLS reasonably relied on those promises in agreeing to become bound by the terms of the Loan Agreements. (*Id.*)

CLS cannot demonstrate that it has a likelihood of success on the merits of its defense because it is barred as a matter of law from asserting its alleged fraudulent-inducement defense by virtue of the merger and integration clauses in the Loan Agreement and due to the releases executed as part of the Third and Fourth Supplements. (Exs. 101, 123-124)  Where, as here, "a contract contains a valid merger clause, the only fraud that can invalidate the contract is where one party induces the other to suppose that the antecedent agreement is included in the writing, or where one party induces the other to forget that agreement and to execute an incomplete writing, while describing it as complete." *Fleet Bus. Credit v. Krapohl Ford Lincoln Mercury Co.*, No. 249825, 2004 WL 2179235, * 2 (Mich. Ct. App. Sep. 8, 2004) (internal quotation marks and citations omitted); *see also Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp.2d 927, 929 (E.D. Mich. 2005) (applying Michigan law and observing that "a merger clause can render reliance unjustified as to agreements, promises or understanding related to performances that are not included in the written agreement.").  Because the pleadings and proffered evidence relate only to performances that are not included in and are inconsistent with the terms of the parties' written agreements, CLS's right to assert the fraudulent-inducement defense "is clearly nullified by the merger clause." *Fleet Bus.*, 2004 WL 2179235 at * 3.

Cases applying New York law[6] have resulted in the same outcome in circumstances specifically involving borrowers' attempts to disclaim liability for loans and

_____

[6] New York law governs the Loan Agreement.  The Court need not decide which law governs CLS' fraud claim at this time because the standards for fraud in Michigan and New York  are "substantially the same," Glidden Co. v. Jandernoa, 5 F. Supp. 2d 541, 551 (W.D. Mich. 1998),

guarantees based on alleged extra-contractual promises by the lender to advance additional sums or modify payment terms. *See, e.g.*, *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 976-77 (N.Y. 1985) (holding that disclaimer in guarantee prohibited borrowers from asserting that the lender fraudulently induced the borrowers to sign the guarantee by oral promises to fund an additional multi-million-dollar line of credit); *Marine Midland Bank, N. A. v. CES/Compu-Tech, Inc.*, 537 N.Y.S.2d 818, 819-20 (N.Y. App. Div. 1989) (same, where lender allegedly made oral promises to alter repayment schedules in written loan agreement if cash flow problems subsequently arose).

CLS -- principally a legal services referral firm -- and Kenneth Stern, a lawyer who is CLS's principal and representative -- are sophisticated parties who are presumed to have fully understood the consequences of agreeing to the merger, waiver and release language in their agreements with Plainfield, including the original loan agreement in connection with the initial $15 million revolving credit facility as well as two supplemental funding agreements entered into by Plainfield and CLS thereafter, whereby the defense they assert here would be barred. *See Wold Architects & Eng'rs v. Strat*, 713 N.W.2d 750, 763 (Mich. 2006) (Corrigan, J., concurring) (equating attorneys with "sophisticated parties"); *see also Mazzone v. Stamler*, No. 89 Civ. 5964, 1991 WL 113275, *4 (S.D. N.Y. June 19, 1991) (observing that "[w]hen sophisticated parties enter into an agreement, particularly if one of the parties is an attorney, they may be presumed to be aware that there are risks involved" in signing a release).    The sophistication of CLS and Stern is buttressed by the fact that Honigman represented CLS at the

---

and are in accord in barring Defendants' fraudulent-inducement defense under the circumstances here.

closing of the Loan Agreement and provided a legal opinion that the Loan Documents were valid and enforceable.  (Ex. 109)

CLS has failed to show any evidence of fraud or mistake in the execution of its agreements with Plainfield, and therefore is barred by the merger, waiver, and release language of those agreements from asserting the fraudulent-inducement defense it has raised here. Moreover, CLS's fraudulent-inducement defense is barred as a matter of law because the particular oral representations alleged by CLS are directly contrary to specific provisions of the written agreements.  Specifically, CLS's claim is that Plainfield promised to lend it up to $100 million.   However, the successive written agreements contain provisions in which CLS's borrowing limit is explicitly limited to a particular sum far lower than $100 million, with said borrowing limit reaching a maximum of $16,785,500 in the parties' most recent amendment to the agreements.  (Exs. 101, 121-131).  On account of the existence of the merger clause, CLS is barred from citing parol evidence that Plainfield promised to extend any greater credit than the amounts specifically listed in the written agreements in an attempt to modify those agreements' terms.  *See Star Ins. Co.*, 392 F. Supp.2d at 930.

Further, even if CLS would have had any valid claims of fraudulent inducement existing prior to June 16, 2006, CLS released them pursuant to the release language contained in the Third and Fourth Supplements. (Exs. 123, 124)   By the date of those Supplements (November 27, 2007 and March 3, 2008, respectively), CLS had been repeatedly asking for increases to the Facility Amount; had not received increases except via the First and Second Supplements; and had been told that the outstanding principal amount could not exceed the Facility Amount as amended by the executed Supplements (see, e.g., Ex. 135).  Under New York and Michigan law, these releases extinguished CLS's misrepresentation claims, and CLS has not

provided any convincing evidence of fraud in connection with the execution of these Supplements. *See, e.g.*, *Dresden v. Detroit Macomb Hosp. Corp.*, 553 N.W.2d 387, 390-91 (Mich. Ct. App. 1996) (holding that the plaintiff's fraudulent inducement claim is barred by the release he executed); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527-528 (2d Cir. 1985) (observing that a fraudulent inducement claim is barred even where the plaintiff claims to be ignorant of material facts relating to alleged fraud prior to execution of settlement agreements).

Separately from the contractual prohibition against CLS's assertion of a fraudulent-inducement defense, that defense is also barred as a result of CLS's failure to tender back the consideration they received from Plainfield in the course of its performance of the parties' agreements. *See Stefanac v. Cranbrook Educ. Cmty*, 458 N.W.2d 56, 58 (Mich. 1990) (holding that a party to a settlement agreement must tender back consideration before attempting to sue on claims released in that agreement); *Central Global Express, Inc. v Silog, Inc*., No. 233612, 2003 WL 1795553, *2 (Mich. Ct. App. April 3, 2003) (same).

The evidence adduced at the hearing and set forth in the admitted exhibits falls short of establishing by clear and convincing evidence that Plainfield made any fraudulent misrepresentations. CLS's fraud claim is premised solely upon Ken Stern's testimony. There are no writings containing the alleged misrepresentations nor are there any writings where CLS itself memorialized its alleged agreement for receipt of $100 million in funding from Plainfield. Moreover, the actual course of dealing between the parties weighs against Defendants' fraud claims since all increases in the Facility Amount were documented in Supplements which were then executed by the parties. (Exs. 101, 121-131). While there are many e-mails from CLS seeking an increase in the Facility Amount (Exs. 139-140, 145-148, 152), there are no documents

from Plainfield with any promises to increase the Facility Amount without a concomitant executed supplement.  The evidence submitted is consistent that, even internally, Plainfield deemed its loan obligation to be only the Facility Amount (e.g., Exs. 135, 137) and was, since late 2007, attempting to work with CLS to try and restructure the loan relationship due to CLS's inability to generate revenue.  (Tr. 2/5, 57:18-58:6; 62:7-16; 64:1-12).

While Defendants claim that their alleged agreement for additional funding is supported by the CLS-generated budgets and the alleged lack of objection to same from Plainfield (which Plainfield denies), submission of budgets does not, under the unambiguous Loan Agreement, operate as an increase in the Facility Amount, even in the absence of any objection to same by Plainfield.  (Ex. 101, §5.2(c)).

Defendants also claim that Plainfield is a predatory lender and intended from the beginning to lure in CLS by making misrepresentations.  The actual testimony is that Plainfield has approximately $3.5 billion under portfolio only a portion of which includes distressed loans. (Tr. 2/5, 18:24-19:5; 98:22-25)  The loan to CLS was a commercial loan; not a distressed loan. (Tr. 2/6, 50:19-24)  There is no evidence of fraud or conspiracy.

## C.   Irreparable Harm:  Potential Loss of Status Quo Security Interest

Where secured creditors (under the UCC or otherwise) seek court intervention to maintain their position, the prospective loss of their *status quo* security interest has been held sufficient to constitute the irreparable harm needed to justify an injunction.  *See Tocco v. Tocco*, 409 F. Supp.2d 816, 831-32 (E.D. Mich. 2005) (enjoining the defendant from transferring or encumbering assets in which plaintiff had an interest in order to preserve the status quo); *Kredietbank N.V. v. Morris*, No. 84-1903, 1985 WL 25625, *1 (D. N.J. Oct. 11, 1985) (observing that the court had previously granted an injunction requiring the borrower's accounts

receivables to be turned over to the lender pending resolution of the lawsuit); *Citizens Sav. Bank v. GLI Tech. Servs., Inc.*, No. 96-2307, 1996 WL 737008, *1 (E.D. La. Dec. 23, 1996) (denying the defendants' motion seeking to dissolve a preliminary injunction restraining defendants "from taking any action which would diminish any assets in which [the plaintiff] maintains a valid and perfected security interest."); *Cashman Equip. Corp. v. Beoufway Contractors, L.L.C.*, No. 07-3829, 2007 WL 3124704, *4 (E.D. La. Oct. 24, 2007) (enjoining disposition of property in which plaintiff had an ownership interest pending arbitration).

Here, Plainfield has a perfected security interest under the Uniform Commercial Code in all of CLS's assets, including its accounts receivable. (Ex. 116)  CLS has claimed a right to divert from Plainfield and convert to its own use the proceeds of resolved cases pledged by CLS as collateral for the $15 million revolving credit facility extended to CLS by Plainfield, in contravention of its security agreements with Plainfield.

As in *Tocco*, *supra*, Plainfield has a security interest in certain assets which it seeks to preserve pending trial in this matter.  Also, as in *Tocco*, there are reasons here to be concerned about the availability of the collateral absent an injunction.  Defendants kept significant assets outside of the CLS lockbox account and failed to reveal the existence of $3.4 million in proceeds ($1.6 million in the JV account, $1.8 million with McKeen) as this Court heard Plainfield's custodian motion, which was premised upon concerns about the status of its Collateral.  Moreover, even after Plainfield filed its preliminary injunction motion, Defendants failed to disclose the existence of the funds (plus the additional $500,000 being held by Villari) and then spent a portion of the funds on non-essential services.  Under these circumstances, Plaintiff has demonstrated that it is likely to not have recourse to other funds should these be depleted, and that CLS cannot be trusted to administer the funds on its own.

CLS claims that Plainfield will not suffer irreparable harm absent an injunction because the cases CLS currently has in process are valued at $27 million and because CLS's intellectual property is valued at $78 million. The Court finds, however, that CLS sometimes overstates the value of its cases. CLS's records demonstrate that CLS collected only 15.76% of amounts in 2008 that it initially projected to collect. (Ex. 179)  Indeed, over 2½ years, CLS collected only $3.5 million (Ex. 180), far less than CLS projected to receive in 2008 alone.

CLS's value projections are based upon a case progressing as projected, which has not occurred. Rather, over 2 years, 76.9% of cases which started as 1A or 1B (and which should have paid out within 24 or 48 months, respectively) either did not change status or inexplicably dropped out. (Ex. 181; Tr. 2/6, 85:6-86:18)  Category 3 cases were worse; only 5.9% of those cases, over 2½ years, progressed upwards from a Category 3 case, whereas 94% were either dropped or remained a Category 3 case. (Ex. 182).

As for the intellectual property valuation, which is in the form of a January 2008 letter from Joel Charkatz to Stern (Ex. 524):

a. The valuation was done as of December 31, 2007 (p. 1) and thus is of questionable relevance in 2009.

b. The letter states that, in fact, it is not a "Valuation Engagement or "Calculation Engagement" in accord with industry standards (*id*. at p. 1).

c. It purports to value the company's intellectual property based upon management's projection of case values, which values were "accepted as correct without further verification" (*Id*. at p. 2, ¶ 2; p. 3, ¶ 10).

d. CLS elected to have the author of the valuation not testify despite his availability.

23

e. CLS itself valued its intellectual property as worth only $50,000 in 2007. (Ex. 158, p.12)

CLS has provided no support for the methodology of the purported appraisal, which depends on discounted projections of CLS's claimed future revenues derived solely from information provided by CLS, and which projections have no relation to revenues actually earned by CLS in the past.  In the absence of any justification for this methodology, the Court deems it to be speculative, and thus of little weight in support CLS's allegations of future solvency.  *See, e.g.*, *LifeWise Master Funding, LLC v. Telebank*, 2003 U.S. Dist. LEXIS 26340, * 67 (D. Utah Mar. 5, 2003)  (observing that projections of future revenues disconnected from past performance and presuming "unprecedented future accomplishments" are inadmissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

Moreover, CLS itself has demonstrated that future collections from Affiliate Law Firms are speculative and uncertain.  CLS claims that Villari and McKeen are withholding $2.3 million from CLS due to claims against CLS and asserting claims in excess of $10 million. (See, e.g., Stern Response Brief, pp. 7, 8)  It is therefore likely that there will not be any future funds sufficient to repay Plainfield if it prevails in this action, or at least no funds as readily available as those currently being held and in which Plainfield has a security interest.

### D.   <u>Harm to CLS and Others</u>

The third element the Court must consider is the degree of harm suffered by the adverse party or third parties if the injunction is granted.  *See Washington*, 35 F.3d at 1099 (harm to third parties); *Vander Vreken v. Am. Dairy Queen Corp.*, 261 F. Supp.2d 821, 825 (E.D. Mich. 2003) (harm to adverse party)  The consideration of injury to third parties is often merged with the consideration of the fourth factor, the public interest, and is addressed in that context below.

24

*See*, *e.g.*, *Conn v. Bd. of Educ.*, 586 F. Supp.2d 852, 865-66 (E.D. Mich. 2008) (discussing harm to third parties in context of public-interest factor). The Court limits its discussion of the third factor here to the issue of potential harm to CLS.

The question whether an injunction would result in undue harm to CLS is based, in part, on whether the injury would be compensable by money damages. *See Little Caesar Enter., Inc. v. R-J-L Foods, Inc.*, 796 F. Supp. 1026, 1035 (E.D. Mich. 1992). Here, if CLS prevails at trial, it  can be fully compensated for any losses by an award of money damages from Plainfield, whose solvency is not in question.

Furthermore, the relief sought by Plainfield here is limited to the enforcement of the security agreement's terms already agreed to by CLS, namely, the payment of accounts receivables into the "lockbox" instead of its diversion into an account controlled by CLS and a third party not bound by the agreements between Plainfield and CLS. *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984) (observing that the debtor has no right to deny a secured creditor "the security position for which he bargained," and further observing that "the promise to maintain the security must be specifically enforced.") (internal quotation marks and citation omitted).

There is no potential for irreparable harm to CLS because any damages to CLS resulting from an injunction would be compensable in money damages, there is no showing that Plainfield would be judgment-proof, and the prospective harm to CLS consists entirely of its being compelled to fulfill its obligations under valid security agreements. Thus, this factor weighs in favor of an injunction.

25

E.    **Serving the Public Interest**

The final factor the Court must consider is whether the proposed injunction would serve the public interest; and, as part of that analysis, whether third parties would be injured. *See Washington*, 35 F.3d at 1099.  "[U]pholding the rights of…secured parties to repossess collateral without awaiting the resolution of unsecured creditor claims is in the best interest of our credit-based economy."  *Foley & Lewis Racing, Inc. v. Torco Racing Fuels, Inc.*, No. 08-CV-13416, 2009 WL 22860, *2 (E.D. Mich. Jan. 5, 2009).  The nature of the relief sought by Plainfield would serve the public interest in vindicating the system of security agreements that makes our economic system possible.

Because the UCC system is designed to ensure that secured creditors do not have to fight with their debtors in litigation in order to obtain satisfaction of monies lent on security, allowing a debtor like CLS to avoid its financial commitments and contractual obligations would not be in the public interest.  This Court concludes that, given the public interest in the enforcement of security agreements, and the lack of any corresponding harm to the public interest in compelling CLS to pay its accounts receivables into the lockbox established by the parties' security agreements, this final factor also weighs in favor of the issuance of the injunction.

F.    **Posting of Security**

It is well-established under Sixth Circuit case law that "the district court possesses discretion over whether to require the posting of security."  *Moltan Co. v Eagle-Pitcher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir 1995) (observing that, although "the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of

26

security.")  *See also NACCO Materials Handling Group, Inc. v Toyota Materials Handling USA, Inc*., 246 F. App'x  929, 952-53 (6th Cir. 2007) (same).   Accordingly, given the sizable amount due and outstanding on the Plainfield loan, and given that Plaintiff seeks to secure the very proceeds pledged in repayment of that loan, and the viability of Plainfield given its portfolio under management, this Court finds that it is not necessary to require Plainfield to post security.

     **G.**      **Proper Scope and Extent of Remedy**

     Given the above findings, the Court believes that the following Order is necessary and appropriate under the circumstances.

     First, Defendants shall immediately, and continually as required to effectuate the result contemplated by the Court's order, deposit all funds in which it has an interest (including without limitation any joint venture account with any Villari affiliate or McKeen affiliate (or otherwise)) in to the lockbox account and shall not use or disburse any such funds except as provided for herein.  CLS shall file a report within 48 hours of the date of the Court's Order and serve same upon Plainfield confirming that this has been accomplished and stating the transfer amount.

     Second, Defendants shall, in writing, immediately notify all third parties, including Villari and McKeen, to hold all funds in which Defendants have or may have an interest, whether contingent or not, and demand that each of them transfer such funds to the CLS lockbox account and otherwise not disburse any of the funds.

     Third, this Court appoints [person to be determined] as a custodian for CLS with the powers more fully set forth in Schedule A attached hereto.  CLS claims that it has certain on-going necessary business expenses and the Court intends to permit CLS to continue to pay such expenses.  CLS, however, has proven itself unable to either faithfully account for all proceeds

(such as the funds in the Villari JV account or being withheld by Villari or McKeen) or to responsible handle sums in its control (reneging on its counsel's promise, CLS improperly expended considerable funds in January out of the Villari JV account).

The Custodian shall have two primary purposes. First, the Custodian shall review and approve necessary business expenses such as payroll, taxes, rent, and the like and to bring any disagreements with CLS to the Court's attention prior to payment of such expenses. This includes both ongoing expenses as well as a review of all expenses paid since December 4, 2008 either by CLS or which were paid out of the Villari JV account, which review shall be accomplished and a report generated to the Court and all parties within 30 days of the date of this Order. This review of past disbursements specifically includes a review of the circumstances surrounding and appropriateness of all attorney fees.

Second, the Custodian shall review as necessary records of CLS regarding the status of cases with Affiliate Law Firms and particularly the status of proceeds from any settled or resolved matters, and report same to the Court within 30 days of the date of this Order. Such report shall include, inter alia, information as to when the settlement proceeds (i) deposited in the JV account in December were received by Villari originally and when CLS/Stern/JV had notice of same, (ii) held by Villari were received by Villari and when CLS/Stern/JV had notice of same; and (iii) held by McKeen were received by McKeen and when CLS/Stern/JV had notice of same.

The Custodian further shall have the powers and protections as set forth on Schedule A.

This Court is authorized to appoint the Custodian as part of its broad equitable powers to fashion an appropriate remedy in response to Plaintiff's Motion for Preliminary Injunction.

Within 7 days of the date of this Order, the parties shall meet and confer on the schedule necessary for the completion of discovery, pre-trial motions and trial, including to what extent this matter may be expedited so as to lessen any claimed impact of the injunction upon either Plaintiff or Defendants.  Any agreed upon schedule shall be submitted to the Court.  If the parties cannot reach agreement, the Court will hold a scheduling conference.

## V.     **CONCLUSION**

The Court holds that all four of the relevant factors to be considered by the Court pursuant to *Washington* weigh in favor of the issuance of the injunction requested by Plainfield. Accordingly, Plainfield's motion is GRANTED.



s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on , by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

## Schedule A

1. **Deliveries to Custodian.**

1.1. The Defendants, and all of their respective employees and agents, are directed to cooperate with the Custodian and provide immediate access to and permit the Custodian to inspect all of the following (the "Delivery Items") pertaining to the Custodian Property (but only to the extent that such items are in their possession, custody, or control):

(a)  All documents relating to payments with respect to all Subject Cases (for purposes of this Order, notwithstanding the definition of Subject Case in the Loan Agreement, Subject Cases shall include all cases that at any time since June 16, 2006 have been Subject Cases whether such cases are at present Subject Cases) received by or for the benefit of Borrower, Stern or any affiliate of the Borrower or Stern.

(b)  A current schedule of Subject Cases.

(c)  A current schedule of Primary Law Firms.

(d)  All agreements of any kind between any Primary Law Firm and CLS or Stern or any affiliate of any of them.

(e)  Retainers for all Subject Cases and other payments in the nature of a security deposit, security deposit accounts, and accounting for security deposits.

(f)  All Initial Subject Case Evaluation Notices.

(g)  All Subject Case Evaluation Notices.

(h)  A list of all payables relating to all Subject Cases.

(i)  Such other records pertaining to the management of the Subject Cases as may be reasonably requested by the Custodian.

2. **Custodian's Duties and Authority.**

2.1. The Custodian shall be vested with and shall discharge the following authority, powers and duties, in addition to those set forth above in the main body of this Court's Findings of Fact and Conclusions of Law:

30

(a)   To access, review, evaluate and report to the Court and the Plaintiff with respect to (without disclosing confidential information with respect to clients in Subject Cases, as such term is defined in the Loan Agreement identified in Plaintiff's verified complaint commencing this action) the Collateral;

(b)   To determine if any of Plaintiff's Collateral has been dissipated in any way or transferred to any party other than Plaintiff;

(c)   To determine if CLS, Stern or any affiliate of either of them is causing or attempting to cause funds that are payable to CLS or should be payable to CLS under any Primary Law Firm agreement (each, a "Primary Law Firm Agreement") with CLS to be diverted, offset, compromised, deposited in any account other than the Defendant Accounts (defined in the next paragraph) or otherwise transferred so as to result in less than payment in full when due to CLS of all sums due and owing under such Primary Law Firm Agreement;

(d)   To access, review, evaluate and report to the Court and the Plaintiff with respect to the following bank accounts (the "Defendant Accounts"), both of which are subject to a Blocked Account Control Agreement dated as of July 12, 2006:  Signature Bank depository account, for the benefit of Lender, account number 1500629971, designated "Plainfield Offshore Holdings XI, Inc., as lender for Children's Legal Services PLLC" and Deposit Account JPMorgan Chase Bank, NA New York, NY 10036 ABA No. 021000021, Beneficiary: Plainfield Offshore Holdings X, Inc., Account No. 957266510.  The Banks at which the Defendant Accounts are on deposit shall comply with any request by the Custodian for information relating to the Defendant Accounts to the same extent as if such request were a request of Borrower.

2.2.  In carrying out the duties contained in this Order, the Custodian is also authorized (but not required), and without personal recourse against the Custodian, to employ attorneys, accountants, agents and other professionals as the Custodian may from time to time deem appropriate on such terms and conditions as the Custodian deems appropriate, but subject to Approval (as defined in Section 4 of this Order).

2.3.  Plaintiff shall be, and hereby is, granted leave to make (but shall have no obligation to make) one or more advances to the Custodian for the purpose of the Custodian carrying out the provisions of this Order.  All advances to the Custodian by the Plaintiff for the benefit of the Custodian Property or any other costs and expenses incurred by the Custodian under this Order shall be deemed protective advances under the Loan Agreement. Any such

protective advances shall be fully secured by Plaintiff's first priority security interest and lien

against the Custodian Property and the Collateral.

        **3.**        **<u>Custodian Compensation, Bond, Reports and Accounting</u>.**

        3.1. Custodian Compensation:

        (a)  The Custodian's compensation shall be $ [to be determined] per hour for all hours reasonably incurred by the Custodian in performance of his duties under this Order, subject to approval by this Court.

        **4.**        **<u>No Prejudice to Foreclosure</u>.**

        4.1. This Order shall not prejudice Plaintiff's foreclosure of its security interests

under the Loan Agreement with respect to the Collateral, or any of Plaintiff's other claims as set

forth in the Complaint or any amended complaint that Plaintiff may file.